838 So.2d 1192 (2003)
Clifford Earl THOMAS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D01-3217.
District Court of Appeal of Florida, Second District.
January 31, 2003.
Rehearing Denied March 5, 2003.
*1193 James Marion Moorman, Public Defender, and Brad Permar, Assistant Public Defender, Bartow, for Appellant.
Charlie Crist, Attorney General, Tallahassee, and Michele Taylor, Assistant Attorney General, Tampa, for Appellee.
BLUE, Chief Judge.
Clifford Earl Thomas appeals his conviction for attempted second-degree murder. Because the trial court improperly commented on evidence critical to the defense, we reverse and remand for a new trial.
Around midnight on August 17, 1999, Mariam Knight Gloster was discovered lying on the ground naked and bloodied with multiple stab wounds. Thomas was charged with attempted second-degree murder. At trial, evidence was introduced showing three different versions of how Thomas spent that evening. According to Gloster, who was a reluctant witness, she was stabbed from behind by an assailant who said nothing before attacking her. There was a lot of tussling for the knife, and Gloster was stabbed eleven to fourteen times. Gloster did not know how her clothes came off, and she denied that the attack occurred during a prostitution-for-drugs encounter. Gloster admitted smoking crack cocaine and drinking several beers prior to the attack. When Gloster was found, she said that someone named "Tim" stabbed her. Later, Gloster identified Thomas from a photopack. She said that she knew him from high school in the 1980's. The neighbors who found Gloster and the responding emergency personnel testified that it was pitch dark in the area where Gloster was found, while Gloster and a law enforcement officer testified that there was some light.
In a tape-recorded statement to law enforcement, Thomas said that Gloster asked if he wanted to have sex with her in exchange *1194 for drugs. Thomas did not have any drugs but he offered her $10. Then, when Thomas told Gloster that he did not have any money, he said that Gloster came at him with a knife. According to Thomas's taped statement, Gloster fell on the knife. Although they struggled, Thomas said he never touched the knife, and he could not explain the number of stab wounds, other than by saying that Gloster kept coming at him and he kept pushing her hand away.
At trial, Thomas recanted his statement to the police. He denied any involvement with Gloster, denied stabbing her, and said that he was home all night. His mother and one sister also testified that Thomas was home that evening, which was another sister's birthday. Thomas's mother testified that she and Thomas watched TV in the living room from approximately 9:30 p.m. until she fell asleep at 12:30 a.m. She said Thomas was on the couch when she went to sleep and he was on the couch dressed in the same clothes when she woke up the next morning. His sister testified that Thomas was on the couch when she went to bed around 10:00 p.m. and was still there, in the same clothes, when she woke up the next morning. She testified that she knew he did not leave during the night because she would have heard a bell that sounds when the door is opened. Thomas and his family all denied that he ever used the nickname Tim. The evidence showed that Thomas and his family lived about seven miles from where Gloster was attacked and that Thomas did not have a car at that time.
In explaining his apparent confession, Thomas testified that he had a conversation with the police before the tape recorder was turned on. The interrogating officer denied any unrecorded conversation but later admitted that there was a brief exchange before the tape was started. According to Thomas, the police told him everything that was going on, told him that Gloster was a known prostitute and drug dealer, and said that Thomas would get off on a lesser charge if he claimed self-defense.[1] Thomas, who has an eleventh-grade education, said that he denied the charges but then confessed because he could not pay for an attorney and he was told by the police that it was the only way he was going to get out. From this brief summary, it is apparent that the defense needed to establish the unrecorded conversation to invalidate Thomas's recorded confession.
During the defense's cross-examination of the interrogating officer, the following occurred:
[DEFENSE COUNSEL]: You indicated to Mr. Thomas that he was going to be arrested unless he told you he did this in self-defense?
[WITNESS]: No. I don't remember that conversation. I remember I told him he was already arrested. That's what I just read here [in the transcript of the taped statement].
[DEFENSE COUNSEL]: And you told him that he wasthe only way he was going to get out of it was to say he did it in self-defense?
[WITNESS]: He didn't know he was going to get out of it.
[PROSECUTOR]: Judge, I would object. This is argumentative, and I don't think it's in the transcript.

THE COURT: Sustained.

CONTINUED CROSS-EXAMINATION *1195 [DEFENSE COUNSEL]: Did you indicate to him that the only way he would get some sort of bond to get out of jail was if he said he did it in self-defense?
[WITNESS]: I just listened to the tape, and I didn't see that in there.

[DEFENSE COUNSEL]: Did you indicate to him at any point that Miriam Gloster was a prostitute and was using drugs?
[PROSECUTOR]: Judge, I would object.
THE COURT: Sustain the objection.
[Defense Counsel], stay with the nature of the conversations between the two.

(Emphasis added.) Defense counsel objected, moved for a mistrial, and requested "some sort of instruction to the jury at this point in that you just said the jury heard the conversations between the two. It's going to be our position that they didn't hear the entire conversations between the two...." The trial court refused, stating that it would give an instruction if the evidence later indicated that such a conversation happened. During the second day of this two-day trial, Thomas testified in his defense and detailed the unrecorded conversation that preceded his taped statement. Recalled in the defense case, the interrogating officer admitted that there was a minor exchange of words before the tape recorder was started but denied that anything of substance was said. Defense counsel did not renew his request for a curative instruction regarding the trial court's statement the previous day.
By its comment for defense counsel to stay within the nature of the conversation between the two, the trial court strayed into a factual issue for the jury's determinationnamely, whether there was an unrecorded conversation that preceded Thomas's alleged confession. Section 90.106, Florida Statutes (2001), prohibits a trial judge from summing up the evidence or commenting to the jury on the weight of the evidence, a witness's credibility, or a defendant's guilt. A defendant is "entitled to a fair trial in accordance with law and with precedents established through the years. One of the oldest of these under our system is an inhibition against any comment by the judge on the evidence in the case." Raulerson v. State, 102 So.2d 281, 285 (Fla.1958).
[A] trial court should avoid making any remark within the hearing of the jury that is capable directly or indirectly, expressly, inferentially, or by innuendo of conveying any intimation as to what view he takes of the case or that intimates his opinion as to the weight, character, or credibility of any evidence adduced.
102 So.2d at 285 (quoting Leavine v. State, 109 Fla. 447, 147 So. 897, 902 (1933)). Viewing the trial court's statement in context with its ruling on the State's objection to defense counsel asking questions about matters that were not contained in the transcript, the jury could have concluded that the trial court did not believe there was an unrecorded conversation between the interrogating officer and Thomas. We conclude the trial court erred by commenting on the evidence.
The harmless error rule applies to this issue, see Millett v. State, 460 So.2d 489 (Fla. 1st DCA 1984), and the State carries the burden "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction," Rigsby v. State, 639 So.2d 132, 133 (Fla. 2d DCA 1994) (quoting State v. DiGuilio, 491 So.2d 1129, *1196 1138 (Fla.1986)).[2] From a complete review of the record, we conclude that the trial court's comment was not harmless error because the trial court commented on the evidence that went to the very foundation of the defense.
In Brown v. State, 678 So.2d 910, 911 (Fla. 4th DCA 1996), the State's case "depended entirely on the testimony of two witnesses whose accounts differed from one another in several respects. Additionally, one's testimony was internally inconsistent and impeached on several points." The Fourth District reversed based on the trial judge's statement, made during the defense closing argument, that there was no evidence either witness had lied. Discussing "the dominant position occupied by a judge," the appellate court stated that the impartiality of the trial was destroyed by comments tending to express a judge's view of the evidence. 678 So.2d at 911. In Esposito v. State, 243 So.2d 451, 452 (Fla. 2d DCA 1970), this court reversed because the trial judge infringed on the jury's deliberations by commenting on testimony by a witness, even though we found "merit to the court's statement." And in Beckham v. State, 209 So.2d 687, 687-88 (Fla. 2d DCA 1968), this court reversed based on a trial judge's inadvertent reference to a gun found at the "scene of the crime," even though the judge later explained to the jury that he had intended to refer to the "scene of the alleged crime" and instructed the jury to disregard his earlier statement.
This case presented a credibility determination between Thomas, who testified in his own defense and presented alibi witnesses, and the victim, who could not recall certain details from that evening and who first identified her attacker using a nickname that only she associated with Thomas. It was essential for the defense to successfully attack Thomas's apparent confession. The trial court erred by commenting, even indirectly, on the existence vel non of an unrecorded conversation between Thomas and the interrogating officer. Given the significance of this issue to the defense, and the lack of overwhelming evidence of guilt, it cannot be said that the error was harmless. "Where there is simply a doubt, as here, that an accused has been prejudiced by a remark of the court, we must grant him a new trial." Beckham, 209 So.2d at 688 (quoting Robinson v. State, 161 So.2d 578, 579 (Fla. 3d DCA 1964)).
Reversed and remanded for a new trial.
DAVIS, J., Concurs.
COVINGTON, J., Dissents with opinion.
COVINGTON, Judge, Dissenting.
I respectfully dissent. The majority's opinion is premised on the notion that the trial court's statement "Stay with the nature of the conversations between the two" is a comment on the evidence. I disagree. The trial court's statement did not amount to a comment on the evidence which would require a new trial.[3]
*1197 The cases cited by the majority, in which new trials were mandated, involve different factual scenarios than the one before us. For instance, in Esposito v. State, 243 So.2d 451 (Fla. 2d DCA 1971), a state witness had been given a concurrent sentence in exchange for agreeing to testify against Esposito. During cross-examination the defense attorney attempted to show that the sentence the witness received was inconsequential. After the State chose not to ask questions on redirect, the trial court judge commented that "[t]he statement that he got nothing [was not] correct and shouldn't be so considered by the jury." Id. at 452. This court found that the trial court had acted improperly in attempting to rehabilitate the witness, when that was the function of the prosecutor, and reversed for a new trial.
In Brown v. State, 678 So.2d 910 (Fla. 4th DCA 1996), the following dialogue transpired during the defense attorney's closing argument:
JUDGE: That is just improper for you to call anybody a liar. It's up to the jury to determine who might be mistaken or wrong.
COUNSEL: I was just
JUDGE: I'm getting so concerned about this that I had to talk to you a couple times, if the state doesn't object. It was improper for someone to call people liars.
COUNSEL: I was just commenting on the evidence.
JUDGE: There is no evidence that anybody is a liar. ... There is all kind of evidence, conflicting testimony, but because somebody isn't consistent doesn't mean they are necessarily a liar. It's not up to you in this court to call anybody a liar. Do you understand that?
COUNSEL: Yes, Your Honor." (emphasis supplied)
678 So.2d at 911 (quotation marks omitted). Likewise, on appeal, the Fourth District reversed for a new trial finding that the trial court's commentary as to the credibility of the witness for the prosecution was prejudicial.
The error involved in Beckham v. State, 209 So.2d 687 (Fla. 2d DCA 1968), involved a comment made by the trial court in a colloquy with counsel concerning the alleged murder weapon. In remanding for a new trial, this court found that the trial court's statement "This was the gun found at the scene of the crime" constituted reversible error. Id. at 687.
Quite simply put, what occurred before the Esposito, Brown, and Beckham courts is significantly different from the exchange that took place in the case at bar. For these reasons, I would affirm the judgment of the trial court.
NOTES
[1] The police were investigating this as an aggravated battery, but Thomas was ultimately charged with attempted murder.
[2] The State has not argued that the error was harmless. Rather, the State argues that the trial court did not abuse its discretion in denying the motion for mistrial and that Thomas was not prejudiced by the lack of a curative instruction because he could have renewed his request. However, "the State's failure to argue harmlessness does not preclude an appellate court from applying the harmless error test, though it is not required to do so." Heuss v. State, 687 So.2d 823, 824 (Fla.1996).
[3] After the exchange at issue took place, the trial court, at side bar, denied defense counsel's request for a curative instruction. However, the trial court gave the defense attorney the opportunity to subsequently seek a curative instruction if there was evidence presented that additional unrecorded conversations took place between the police officer and Thomas. As recognized by the majority, despite the fact that there was testimony by both the police officer and Thomas concerning the unrecorded portion of the interrogation, the defense attorney did not seek such a curative instruction at a later time.